Patel v. Portfolio Diversification Group Mr. Rao Thank you, Your Honors. May it please the Court. I'm here arguing on behalf of both appellants, Mahendra Waga and Portfolio Diversification Group. The basis of this appeal is very straightforward and simple. At heart, the case below is a contract dispute over investor agreements, and the issues at play should have been and are what the meaning of those contract terms are. As briefed in our papers, and just very quickly to run through a few key facts, appellee Mr. Patel invested over half a million dollars with my clients, Mr. Waga and Portfolio Diversification Group. In the course of making that investment, he signed several contracts, account opening documents, margin documents, and other contracts, discussing in clear language that he would be authorizing the trading of options on margin, that he had spoken to his investment advisor about the inherent risks of option trading, and that he was aware of those risks. Well, what I find puzzling, the contract says, talks about what IAR will buy, sell, exchange, etc. It says that this is all designed to seek investment returns suitable to the investment objectives and goals of the client. But those objectives and goals, they aren't set out in the contract, are they? Well, your honor, they are. Where? Sure. So, the first reference of investment objectives is in paragraph one of the agreement for investment management services. And just to clarify, IAR is the investment account representative. Wait, wait, what sentence? The one I just read? It's appendix page 60, paragraph 1. Wait a minute, I'm looking at the agreement, the agreement for investment management services. Yes. Now, what do you want me to look at? The line that you just read, seek investment returns suitable to the investment objectives and goals of the client. Where's that in your appendix, what page? Page 60. Seek so? Seek so, yes, your honor. Immediately following that, in the same sentence, in parentheses, it states, for limitations on securities to be traded, see exhibits. In paragraph two, those exhibits are discussed as the custodian documents. And as your honors are aware, there were several documents signed with the custodian, TD Ameritrade. Let me give you a hypothetical. I'm concerned about the same thing, Judge Posner. Suppose after receiving his first statement showing options trading, that Patel calls up Waga and says, I do not wish to trade options. Please invest all of the money in a money market fund. Could Waga have said, I'm sorry, you've already signed away your ability to make that choice. This is an integrated contract, and you can't change your mind, and hung up. Could he have done that? I mean, keeping in mind that that's... Could he have done that? Yes, your honor. Or sorry, no, your honor, he could not have. He could not have done that. And why could he not have done that? Because this is a discretionary account under case law and under... Exactly. Right. And he therefore has the ability to convey to the broker what his investment objectives are at any moment. Right? There's no argument with that. I will add one caveat. There is. Your whole argument is that this is an integrated contract, and therefore any evidence of oral statements like, I want a safe investment, have to be ignored. Well, to be consistent, you then have to answer my question by saying, no, he couldn't do that, because it's an integrated contract, nothing oral ever matters, and the only thing he could do is say, I would like to renegotiate the written contract. But you are not taking that position because it's not... Allowing the investor to give directions. Right? But the contract says that those directions have to be communicated in writing, and that answers the problem of integration, because should the... Could you speak up a little bit? Sorry, should the investor... All right, then you had to answer my question saying, Waga could have said, I am going to ignore your direction. It does not comply with the contract. I understand. I apologize, Your Honor. The answer to your question is, unless those changed instructions are communicated in writing, Waga could ignore those oral statements. Do you think this is an integrated contract? I do, Your Honor. Then there's no integration clause, so you're admitting that this still is an integrated... Well, the issue of an integration clause is certainly not dispositive. Well, it's helpful. It's helpful. It's probative. It's not dispositive. It's helpful that it's not there. The problem really with saying this contract is not integrated is that the law imposes obligations on investment account advisors. I agree. I understand that. And every discretionary account would be disintegrated because every discretionary account advisor has an obligation to have conversations, continuing conversations with their client about their goals and objectives and to manage the account subject to those conversations. So if that alone were enough to disintegrate this contract, it would disintegrate every investment advisor. Well, where do the investment objectives and goals of the client – they're not in writing, right? So, Your Honor, there is a notion that Patel will tell Waga from time to time what his objectives and goals are? Well, no. There's several clauses here that bear on that question. But the first thing I would like to say is that there's a clear reference... Where are the investment objectives set forth in the contract? In the custodian documents that are referenced in this agreement. So what's an example? So an example would be the Client Options Account Agreement, Paragraph 4. Is this Paragraph 4 of the same agreement? No, no. It's one of the custodian documents that's referenced in the investment agreement. So what does Paragraph 4 say? It says, I represent that I have discussed my options information and the suitability of trading options in my account with my advisor. My advisor has explained to me the type of options trading that corresponds to each level below. Based on these conversations, my advisor and I have determined... That doesn't sound like an integrated contract. That sounds like a specific reference to oral exchanges. Which are then incorporated into the agreement in this writing. Are they all written down? Everything that Patel said written down? I couldn't find that. Well, Your Honor, actually one of the problems here is that there was a place in the investment advisor agreement for Patel to write down restrictions, and he chose not to. And a trial testified that he had the opportunity, but chose not to. So the written contract says, we've discussed something orally. Right? And then come the trial, Patel wants to show the jury what it was, concretely, that they discussed orally. How is the writing stating, we discussed something orally, incompatible with that? Because the writing also states what they discussed and what implications that had. Where does it state what they discussed? Where does it state Patel's decision on the risk-return tradeoff? It says that based on those conversations, they've agreed on a risk level, and it's outlined in the agreement. But it doesn't set out what it is, does it? It doesn't state the exact substance of those conversations. That's the problem, right? You've got a written contract that refers to oral discussions, saying we've discussed investment objectives. That's fine. But it doesn't say what the discussion was. It doesn't sum it up. And then come the trial, the plaintiff wants to show what that was. I don't see how that's forbidden by the contract. Well, Your Honor, it does sum it up. It says based on those conversations, this is the risk level that we are agreeing to for this account. And the problem is that the oral testimony that was provided directly contradicted those terms of the contract. It's one thing to introduce oral testimony to clarify or expound upon what those conversations were substantively. But here, the oral testimony by Patel was that he never discussed these types of risk parameters with the advisor. He never received the disclosures, which are stated in here, which he signed a contract saying, I received these disclosures and agreed to these risk parameters. So we have two problems. I mean, the first is the problem of integration. The second is that the use of the testimony here, the testimony was used to attack the terms of the contract, not to clarify them. But look, you have this sad letter from Patel about he's so concerned what happened to my account and this and that. And the response by your client was your worry and anger are justified. Doesn't that sound as if he agrees with Patel that he had, or at least it would be possible for a jury to conclude, that Waga was agreeing with Patel's letter, which he's responding, that Waga had not done what he promised to do? Well, no, Your Honor, because he testified at trial, and that ignores the latter half of his email, which is much more specific. Pardon? That ignores the latter half of his email, which is much more specific, which outlines exogenous market reasons. Well, wait a second. Why? He says your worry and anger are justified. Are you saying he takes this back later? At trial, he said any time he loses money for a client, he always reassures them that he's taking responsibility and he's going to make the account better. You always say to the client your worry and anger are justified? He testified at trial that he reassures the client that the money will come back because the stock market has ups and downs, and to stick with me, and these are the market reasons why your account went down, and it's clearly stated here. Oh, you're now making it sound like an element of fraud. It's a standard lulling device. When the fraudster is caught out, the fraudster tries to lull the client into leaving the money with him for a little longer. Is that really the position you want it to be? No, I'm just saying as an experienced investment advisor, he knows that the market goes up and down, and he's identified exogenous factors here that led to the. Then why does he say your worry and especially your anger, why does he say your anger are justified if this is just some normal swing, you know, and not to worry about it and so on? Well, look, surely any. He says my action backfired. Because of the dollar, the infighting in parties about debt, and the fall of the stock market, those exogenous factors caused the account to fall. Surely anybody who has just lost a large sum of money would be worried and angry, and I think that's all he's saying. No, look, Patel's argument, what the jury obviously believed, is that he had told Waga he wanted a safe investment. Let's just conceptualize that as a beta-1 investment. It was going to move with the market. Sure. Right? And he discovers that his broker has made a beta-3 investment, goes up three times as fast as the market, goes down three times as fast. Right? If he had made a beta-1 investment, and it had just gone down with the market, there's nothing to apologize for. That's just the market goes up, the market goes down. But if you make an investment that goes down three times as fast as the market, or four times as fast as the market, and the market goes down, then you've got something to apologize for. And this does seem a letter of apology. That's what this case is all about. You have a client who wanted a beta-1, or maybe a beta-0.5 investment, and got a beta-5 investment, or maybe a beta-10 investment. The problem with what Patel said is it contradicts the documents he signed and the statements he received. He never complained when his account went up. When he saw a $162,000 profit in a month on a half-a-million-dollar investment, he didn't say, stop investing my account in high-risk options. And when he had pie charts on his statement that showed most of the money in options. This is a man with a college degree, a sophisticated businessman. It's very hard to explain. I mean, we have documents that he received and read and testified that he received. A man with a college degree doesn't necessarily know what beta means in talking about market transactions. Sure, but he understood risk enough to testify at trial that he knew he couldn't receive that kind of return in a month without a risky strategy. He said that at trial, and it stands to reason. So he only complained after the account lost money. He didn't complain when it was doing well. He didn't say stop trading risky options. So his testimony that he wanted a beta with the account is flatly contradicted by the contracts. But Waga didn't respond to any of this. Waga is all apologies. He's not saying you've misunderstood and this and that, right? Well, granted, Your Honor, he could have been more articulate. It's hard to get around for me. Get around. Your worry and anger are justified. Sounds like the end of the case. I take full and complete responsibility. And the problem then was that the account. I didn't give him a cent back, right? He basically said the account will come back. It was rapidly defunded shortly thereafter because Patel removed money. But what was left did come back, did appreciate significantly. And it's speculation whether the account would have come back had he left the money in. But I think what he's saying is you've just lost a lot of money. Your worry and anger are justified. These are the market factors. I don't think. That's what this email says. Well, did he get his money back? He asked for the money back and got it back, what was in the account. Yeah, what was left. What was left, yes. He lost $200,000 in his net, right? He lost. He went down to. He put in $500,000 and he got back $300,000 or something like that. He got back $175,000, I believe. The account had gone up to $700,000 and changed and then had come down and he got that. There was a small balance left in the account, which it did appreciate, and then that was taken out. We are sort of speculating as to whether had he kept the money in, whether it would have come back. But certainly there's data to suggest it would have. Okay. Thank you, Mr. Rao. Thank you. Mr. Kimball. Mr. Rao, where are you going? Sorry. He's gone. Good morning. May it please the court. Counsel, my name is Jennifer Kimball. I'm here on behalf of the Appalachian Hotel. We're here to ask that the rulings of the district court be affirmed. Certainly this is a case, as was just discussed, where we have two sets of guidelines happening. There's the written contract agreements and it's a discretionary account that was set up here, which gives the investment broker, the advisor, WACA, some discretion to make the investments in line with what Mr. Patel wanted. In addition to that, we have Mr. Patel's investment objectives. What is he seeking to accomplish here? There was significant testimony at trial as to what that was. Counsel's argued, they argued at summary judgment, and he argued today, that none of that extra contractual information should have come in in terms of what Mr. Patel's investment objectives were. The problem with that, as the panel has pointed out, is that the client investment objectives are mentioned throughout the contract documents. That very first paragraph of the client account agreement states that the firm, meaning WACA and his firm, will buy, sell, exchange, convert, and otherwise trade in any and all mutual funds, amenities, annuities, and life contracts and subaccounts, thereof, stocks, bonds, and other securities consistent with the investment analysis, interpretations, and judgments designed to seek investment returns suitable to the investment objectives and goals of the client. Counsel, in discussing this paragraph, says, well, there are other agreements that need to be looked at. And there are several other agreements. There are agreements that talk about options. Patel signed off and gave approval to trade in options. That doesn't mean, as the panel pointed out, that doesn't mean that he said full speed ahead, let's throw $500,000 in options and see how this works out for me. It's not inconsistent to say, I'll give you authority to trade in options, but you need to do so consistent with my investment objectives. And his investment objectives were very clear, and he testified about this at trial. He testified about a discussion, right? Because you don't think this is an integrated contract, right? I do not believe it's an integrated contract, no. But you're basing on a discussion that occurred in the process, I guess, of opening the account. That is correct. There were multiple conversations that took place between Patel and WACA, both immediately prior to opening and around the time of opening the account, where Patel said, in essence, I need to pursue a strategy that's going to help me preserve capital to the extent possible and allow for significant liquidity because this wasn't intended to be a long-term investment for him. He knew he only had a matter of months, and he knew that he needed to be able to pull at least the great majority of the principal out. The jury heard all this, right? Pardon me? The jury heard all of this. Yes, the jury heard all of this testimony. They did. And they found that these objectives were communicated to Mr. WACA before making these investments. Counsel pointed at the agreements and says, well, if I'm allowed to engage in options trading, then no other objective is relevant because we've decided that Tier 2 options trading is permissible. But it's certainly possible that WACA could have pursued a more conservative investment strategy and still exercised his discretion in trading in options. For example, he could have taken $50,000 or $100,000 out of the $500-something thousand and put that in options to try to get some sort of return on this account that he knew he was only going to have for, say, six months or so. That doesn't sound right. That's a risk-increasing strategy. It is, but… It sounded like your client wanted a beta of less than one, which, of course, you can get with options. You would buy an index fund and then put options against it in order to hedge the risk that the mutual fund would go down. I mean, there's nothing about options that increases risk. They can be used to hedge as well as to speculate. Both sides in this case seem to be assuming that options are used only to speculate, and that's just not how they work. Right, and I think that that assumption comes from the language in the options account agreement that talks about the risk of options and acknowledges that there's some risk of options. Naked options are risky. Options used to hedge reduce risk. As I say, both sides are assuming that options are used only to speculate, and there's nothing in the nature of options that determines that they're used as speculative investments. Right. Well, I agree with that, but I think in addition, I think what we're responding to here is the language in the options account agreement that talks about it's not just the parties are assuming that options are risky, but there are disclosures saying, hey, there's risk inherent in options. And what I'm saying is that, yes, the client was aware that Patel signed off and authorized a certain level of options trading, and he had some disclosure that options trading is risky. What I'm suggesting is that you can create a diversified portfolio where you are taking risks with a small portion of the funds and not risking the entire fund itself. These are not mutually exclusive ideas. I agree, yes, there's some options trading that is not risky. There's also documentation that says some options trading is risky. So he knew that. Well, you're suggesting they do limit it to 5% of the portfolio or something. I'm suggesting there's a way, even taking it as a given that because the documents say so, that options trading is inherently risky or riskier than other types of investments. I'm saying, yes, there's a way to trade a half-a-million-dollar fund and allocate some of that to options trading, even a risky type of speculations options trading, without risking the entire fund, which would have both allowed FUAGA to exercise its discretion, granted to him by the papers, and at the same time also would have protected Patel in his investment objectives, which, like I said, is to preserve the bulk of the capital and to maintain significant liquidity. Well, I don't. Judge Easterbrook is certainly the one who can explain this better than I, but these must have been naked options. Oh, yeah. Oh, yeah. I don't think that Mr. Patel understood exactly which kind of options or what options were there for options. I'm not sure that he knew. It's a big difference if you don't do both ends of the transaction. Right, right. What he was looking for was a safe, short-term investment. If it makes little money, great. And he testified to the jury that, you know, if my money comes back flat, that's fine. You know, this guy seems like a really good businessman. You know, he's opened, what, five or six of these, what are they? The 7-Elevens. He's been very successful. Yeah, and doing really well with them. And he has $500,000 that he wants to invest in another one, but he doesn't want to do that for several months. So he sounds like a pretty good investor when it comes to restaurants or whatever. Certainly. And he put in, yes, he's a good business person, but he also invested in his testimony while he was at trial. This is a guy that made the money by putting in his time. He works these stores open to close. So a lot of the way that he was able to save that kind of money was because he didn't hire employees. Would you say the stores open to close? He would work them from the opening time in the morning, and he'd stay at the store until it closed at night. Okay. And, I mean, he was an extremely hard worker. So, yes, he's a savvy business person, but he wasn't sitting behind a desk somewhere buying and selling businesses. He's working now. Right, right. So he's certainly an on-the-floor business fellow. And he was able to amass a fair amount of money, and he understood that there might be money to be made here in the short term, but he wasn't looking to put all of it at risk, nor could he afford to do that, which is why he had these conversations. And this is all testimony that the jury heard, and the jury made a decision on it. You know, counsel's argument isn't that we weren't told this. His argument is it doesn't matter what we were told. Looks like both sides kind of lost on this one. Well, yes. I mean, we got back a portion of our funds, and we're still out a significant portion as well. I think the issue is that this was a discretionary account. Yes, my client has business experience, but his business experience is running a cash register, ordering inventory. It's very concrete, you know, ground-level business work that this gentleman has done, and he's made a lot of money at it. He encountered this investment advisor that had decades of experience that said, I know what I'm doing. I'll handle it. I understand what you need. I understand what you need. I'll make it happen. I know when you need the money back. I know what you need here. Don't worry about it. And Patel went back even after he had given the money and, again, expressed some concerns. And like I said, basically, I've got this. Don't worry about it. He was entrusted to exercise his discretion in a way that comported with what Mr. Patel's needs were. And that's the testimony that the jury heard. The jury determined that he didn't do it. And that's why the jury found it in our favor, and that's why we're looking to have that judgment affirmed. Is that it? Unless you have further questions. Okay. Well, thank you very much, Ms. Kimball. Mr. Rao, your time has expired, I think. But if you want another minute or so, you may have it. Your Honors, the only thing that I can add here is that the problem at the heart of this case is that the testimony that was presented to the jury contradicted the nature and the terms of the contract signed by Patel. This was not just one reference to risk. This was not just one reference to options. This was repeated references to risk and options. And in the light of Patel's own failure to write any instructions, when given the opportunity to in the contract, to write any instructions restricting securities trades, it just flies in the face of the written contract to present contradictory testimony in this manner, and it really strikes at the heart of investment contracts generally. And as a precedent, it's very problematic because it means investment advisors cannot rely on the contracts that they enter into at the outset that an investor who loses money can remember a conversation later and attack the heart of the contract and the authorizations that are required. That's why broker-dealers always record conversations with investors. I take it that this conversation was not recorded. Well, my client's testimony was that the conversation testified to never happened, that there was an entirely different conversation which is reflected in the contracts and not what Patel testified to. He couldn't record a conversation that never happened. That would be difficult. His view is that it was based on brokered testimony. I understand that's not the stuff out of which appeals are made. We're talking about law, and I'm trying to address the issue of integration. When can extraneous information be used? It really should be used to clarify and not to undermine the very purpose of a contract. Okay, well, thank you very much, Mr. Barrow and Ms. Kumble.